Filed 9/14/21  Walker v. The Department of Consumer Affairs etc. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SAM WALKER & SAM WALKER CPA, INC., | B300723 |
| Petitioners and Appellants, | |
| v. | (Los Angeles County |
| THE DEPARTMENT OF CONSUMER AFFAIRS, CALIFORNIA BOARD OF ACCOUNTANCY, | Super. Ct. No. BS171533) |
| Respondent and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Samuel Walker, in pro. per. for Petitioner and Appellant Samuel Walker.

The Law Office of Sam Walker and Sam Walker, for Petitioner and Appellant Sam Walker CPA, Inc.

Xavier Becerra, Attorney General, Carl W. Sonne, Senior Assistant Attorney General, Joshua A. Room and Linda L. Sun, Supervising Deputy Attorneys General, Stephen D. Svetich, Deputy Attorney General, for Respondent and Appellant.

_____

Petitioners, appellants, and cross-respondents Sam Walker and Sam Walker CPA, Inc.,[1] appeal from a judgment granting a petition for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5.  In the petition, Walker sought to compel respondent and cross-appellant California Board of Accountancy, Department of Consumer Affairs (the Board) to vacate an administrative decision imposing discipline against Walker.  The trial court granted the petition in part, finding Walker was entitled to further examination of the Board's expert witness, and remanded the matter to the Office of Administrative Hearings.  Walker does not challenge the portion of the order remanding the matter for further testimony, but contends the trial court should have granted the petition on additional grounds

_____

[1] For clarity, Sam Walker CPA, Inc., will be referred to as "the Corporation."  The parties will be referred to collectively as "Walker," except for a few instances where it is clear from context that "Walker" denotes the individual.

2

as well, including that: (1) professional negligence for the purpose of disciplinary action under Business and Professions Code section 5100 requires finding serious misconduct, causation, and harm;[2] (2) Walker was entitled to have notes from an investigative hearing produced in discovery; (3) certain findings by the trial court were not alleged in the Board's amended accusation or were not supported by substantial evidence; and (4) the accusation was barred by the statute of limitations and laches. We conclude that because Walker was not aggrieved by the trial court's order and has not yet exhausted his administrative remedies, his appeal must be dismissed.

In a cross-appeal, the Board contends the trial court erred by remanding the matter for further examination of certified public accountant (CPA) Kay Lewis. We disagree. The administrative law judge consistently instructed the parties during the administrative hearing to treat Lewis as a percipient witness only. The Board's designation of Lewis as an expert after the administrative hearing concluded rendered the administrative proceedings fundamentally unfair. Walker was prejudiced, because he was deprived of an opportunity to fully cross-examine Lewis on the foundation and formation of her opinion as an expert. The trial court's order remanding the matter to the Office of Administrative Hearings to allow further examination of Lewis is affirmed.

---

[2] All further statutory references are to the Business and Professions Code unless otherwise stated.

3

# FACTUAL AND PROCEDURAL HISTORY[3]

## Tax Returns Prepared for Taxpayer 1

Walker worked as a business tax auditor for the California State Board of Equalization for two years, until July 2008. During that time, on March 13, 2008, the Board issued a CPA certificate to Walker as an individual. He began attending law school in 2008 and received his law degree in May 2011. The Board issued a CPA corporation certificate to the Corporation on March 23, 2011. Walker prepared eight tax returns for the 2011 tax year, which was the first year of his practice using e-filing software published by Lacerte.

Taxpayer 1 paid $125 for Walker to prepare and file her 2011 tax returns. She provided him with a W-2 reflecting gross wages from her employment with the County of San Bernardino and a Form 1099-MISC for wages that her deceased son earned from the Defense Financing and Accounting Service, which Taxpayer 1 had received as the beneficiary of a deceased employee.

The instructions on the back of the 1099-MISC form noted that the amount should generally be reported as "other income" on line 21 of a Form 1040, but Walker combined the amounts from the W-2 and the Form 1099-MISC as "wages" on line 7 of an

---

[3] In accordance with the standard of review, we state the facts in the light most favorable to the judgment based on the factual record developed to date. Because the judgment of the administrative agency has been reversed and the matter remanded for further evidentiary proceedings, the facts have not been conclusively determined.

IRS Form 1040A. Relevant tax publications state that inherited wages retain their character, providing colorable support for Walker's decision to report the amount as "wages."

Walker input an employer identification number incorrectly. He attempted to electronically file Taxpayer 1's tax returns on Friday, February 17, 2012. He did not obtain Taxpayer 1's signature on a Form 8879 to authorize electronic filing prior to submitting the federal tax return.

Walker sent an email to Taxpayer 1 at approximately 7:00 p.m. stating that he had received an error message because he did not have "the address of your w-2 for the defense fiance corp [sic]" and asking her to send the address for that employer. At approximately 8:00 p.m., Taxpayer 1 emailed the Form 1099-MISC to him, which had the address of her son's employer, as well as the payor's identification number.

A little before 9:00 p.m., Walker emailed copies of Taxpayer 1's 2011 federal and state returns to her and wished her luck in her probate administration. At approximately 10:30 p.m., Taxpayer 1 replied, "The instructions for the 1040A indicate that I needed to file a 1040 because I received a 1099-MISC, but you filed a 1040A. Could you please explain?"

Taxpayer 1's state tax return was accepted for filing, but the federal tax return was rejected. The software generated a rejection diagnostics report stating that the federal return e-postmarked on February 17, 2012, at 7:28 p.m. was rejected by the federal taxing agency on February 18, 2012. The diagnostic directed Walker to take four steps, including verifying the employer identification numbers on all of the W-2 forms, before refiling the corrected return at no additional charge.

On Saturday, February 18, 2012, Walker sent an email reply to Taxpayer 1, "The instructions you read are wrong. You don't need to file a 1040 because you were not required to file schedule C." Later that night, Taxpayer 1 attempted to direct Walker's attention to the back of the 1099-MISC which stated, "Box 3. Generally, report this amount on the 'other income' line of Form 1040 and identify the payment. **The amount shown may be payments received as the beneficiary of a deceased employee**, . . . . [sic]" Walker replied on Sunday, February 19, 2012, "Keyword 'generally'. Your taxes are prepared correctly. If you have any further questions call me."

Walker left Taxpayer 1's federal tax return in a rejected status. He never tried to correct the employer identification number or refile the return. At the end of the week on Friday, February 24, 2012, Taxpayer 1 contacted the IRS for clarification about whether she should have filed a Form 1040. She sent an email to Walker stating that the IRS told her to file Form 1040 and identify the type of income shown in box 3 of the 1099-MISC on line 21 as other income, because the Form 1099-MISC reported income that she received as a beneficiary, not wages that she earned. She added, "The IRS advised me to file an amended return now, rather than waiting to be notified by the IRS that I failed to report the income shown on the 1099-MISC. Please let me know how you intend to handle this."

Walker replied that day, "I believe your taxes are prepared correctly. My services are finished. . . . I am sorry that you do not agree with me about the correct way to file your taxes. You are free to find someone else to amend your tax return but I will not change the tax return that I have prepared for you. Please, find some[one] else for any further services that you may need[.]

6

I believe that you would be better off preparing your taxes with someone else in the future."

Taxpayer 1 responded that she was very confused and he had refused to answer questions until she paid for his services. Had the IRS advised her that it was permissible to file a Form 1040A, she would not have asked Walker to amend her return. She stated that she would contact the IRS on Monday "to inquire as to how I should go about amending a tax return that a CPA submitted on my behalf."

Walker replied, "you have a lot of built [up] frustration and I don't appreciate you taking it out on me." He told her that if she wanted to rely on the IRS help line to prepare her taxes, that was her choice. He reminded her of details from prior conversations and added, "Again if you are confused stop emailing me and call me and i will be happy to explain everything as I have repeatedly told you. Again I am not here for you to let out your frustrations after your tragic events that have unfolded for you and your family over the last several months. I am sorry for your loss. Please, seek tax advice elsewhere. thank you. [sic]"

That day, on February 24, 2012, Taxpayer 1 filed a complaint against Walker with the Board. She alleged Walker refused to answer questions about her 2011 return until paid, insisted he had correctly combined income from her W-2 with a 1099-MISC on a Form 1040A, and when the IRS advised her to file an amended return, insisted that he had filed the return correctly. She believed that if Walker had made a mistake, he should fix the mistake or refund her money. The Board notified Walker of Taxpayer 1's complaint on March 21, 2012.

On March 23, 2012, Taxpayer 1 called the IRS to inquire about her income tax refund and learned that her federal tax return had been rejected and never filed, because the employer identification number reported for her W-2 was incorrect. She filed a corrected return herself on March 24, 2012, and received confirmation that it was accepted. She wrote an email to Walker asking him not to file any new or corrected state or federal 2011 return on her behalf to avoid any confusion. Walker never offered or provided a refund to Taxpayer 1.

**Preparation of Taxpayer 2's Tax Return**

Taxpayer 2 and his spouse paid $150 to Walker to prepare their 2011 tax returns. Taxpayer 2 provided Walker with a W-2 showing receipt of $5,000 in dependent care benefits paid by his employer. He also provided a Form 1099-R for a gross annuity distribution. The plan administrator included the early withdrawal code for the distribution, although another box on the form indicated that no contributions had been made to the investment within the past five years.

Based on the information that a tax preparer enters, Lacerte software generates a federal tax Form 2441 for child and dependent care expenses. A taxpayer who did not receive any dependent care benefits completes the first page of Form 2441. A taxpayer who received dependent care benefits completes the second page. If the software functioned correctly when Walker entered Taxpayer 2's receipt of $5,000 in dependent care benefits, it should have populated the second page of Form 2441 and precluded Taxpayer 2 from claiming any further child care benefits. Other than Form 2441, the dependent care benefits

8

received from an employer will not be shown anywhere else in the tax summary or the tax return provided to the client.

In the copy of the federal tax return that Walker provided Taxpayer 2, the first page of Form 2441 was populated, providing Taxpayer 2 with a $600 credit for child and dependent care expenses, and the second page of the form was not generated. The federal tax summary clearly showed that Taxpayer 2 was receiving a $600 credit for child and dependent care expenses. Walker did not notice, however, that the software calculated a $600 credit for child and dependent care expenses that Taxpayer 2 was not entitled to claim.

Although an early withdrawal code was included on Form 1099-R for Taxpayer 2's annuity distribution, Walker did not include a ten percent early withdrawal penalty for the withdrawal. Taxpayer 2 did not provide Walker with any information showing that he received a California state tax refund in 2011, so Walker did not know to include a state tax refund as income on the federal return. Walker filed the returns electronically in March 2012.

**Enforcement Advisory Committee Investigative Hearing**

The Enforcement Advisory Committee (EAC) is a committee of volunteers who assist the Board with investigations. On October 18, 2012, the EAC held an investigative hearing. Walker appeared and testified at the hearing on his own behalf without counsel. He explained that at the time of Taxpayer 1's complaint, he had been in the process of establishing his business for a few months and recently purchased the software to run the business. Taxpayer 1 usually prepared her own taxes. She felt

9

she needed the protection of a third party preparer for her 2011 tax returns, based on potential financial complications from her son's death and administration of his estate.

Walker acknowledged that 1099-MISC income should generally be entered as "other income" on line 21. However, payor and payee information does not have to be disclosed for miscellaneous income, and Walker wanted to disclose the payor and payee information in this case to preclude allegations of fraud. He believed the software would not allow him to include payor information for miscellaneous income, so he entered the amount as wages on line 7. Walker believed this was a situation in which the general instructions did not apply. When all of Taxpayer 1's income was entered as wages on line 7, the software automatically generated Form 1040A, rather than Form 1040. Whether the income was reported on line 7 or line 21, the tax calculation was the same.

One of the examiners, who used Lacerte software, stated that payor information can be input on line 21 and explained the procedure to enter it. Walker acknowledged that he did not contact Lacerte for assistance about how to enter the information that he wanted to report. If he had known payor information could be entered on line 21, he would have reported the amount on line 21.

The federal tax return was rejected because he entered incorrect information for the employer identification number. He testified that he asked Taxpayer 1 to provide the address again, entered it, and the return was rejected a second time because of an incorrect identification number. He never attempted to correct the identification number and refile the return after that. He asserted that before he could correct the error, Taxpayer 1

instructed him not to file her return and disengaged his services. He also testified, however, based on the same email exchange, that he told her the return was rejected and asked for correct information, but she never provided it. He stated that he would have filed her federal return if she had given him the correct address and the correct identification number.

## Investigation and Complaint by Taxpayer 2

Kay Lewis was the Investigative CPA for the Board assigned to investigate Taxpayer 1's complaint. The Corporation's certificate expired and was not valid as of April 1, 2013. Lewis issued findings and conclusions on October 8, 2013, including a determination that Walker's testimony demonstrated a lack of knowledge about preparation of tax returns using Lacerte software.

In December 2013, the IRS issued a notice to Taxpayer 2 and his wife that they owed an additional tax liability of $1,387, plus interest of $74. The IRS notice showed that Taxpayer 2 correctly reported dependent care benefits of $5,000 had been received from an employer, but incorrectly claimed an additional $600 credit for child and dependent care expenses. In addition, taxes were owed based on early withdrawal of funds from a qualified plan, and the return failed to account for the state income tax refund of $150. No penalties were assessed. Taxpayer 2 contacted Walker for an explanation.

On December 23, 2013, Walker sent an email to Taxpayer 2 stating that the amount of the deficiency was correct. He directed them to pay the amount due and offered to discount the cost of their next tax return or issue a check in the amount of $74

11

to cover the interest that had accrued on the unpaid taxes. Walker explained that they were not entitled to a credit for child care expenses because they had already received dependent care benefits. He added, "I am not sure why this was overlooked."

Walker sent another email stating, "I have included an amended return so that you can review. Also, I prepared your CA amended return which you should file and pay the increase as well. Please, note that the retirement benefits from met-life were also taxable as per the IRS detail that they provided." An amended return dated December 26, 2013, was prepared by the Corporation.

On January 11, 2014, Taxpayer 2 filed a complaint against Walker with the Board, alleging that Walker did not correctly complete Taxpayer 2's 2011 tax return. Due to the simplicity of the return, Taxpayer 2 believed the errors demonstrated incompetence, and he wanted Walker to pay the additional tax owed, the interest due, and the cost of tax preparation. The Board assigned the investigation of Taxpayer 2's complaint to Lewis. Ultimately, Walker apologized to Taxpayer 2 and refunded a total of $226 for tax preparation fees and the interest incurred.

On May 15, 2014, the Executive Officer of the Board (Complainant) filed an accusation against Walker with the Board. Lewis investigated Taxpayer 2's complaint and issued findings and conclusions on November 3, 2014. In her factual findings, Lewis stated the dependent care benefits reported on the W-2 and the tax credit for child and dependent care expenses were both included on the 2011 Form 1040 prepared for Taxpayer 2, when the tax rules do not allow both benefits to be claimed. Walker failed to include a ten percent early withdrawal penalty,

12

even though the Form 1099-R from the plan administrator had included the proper code to report an early withdrawal.

Lewis found Walker did not take responsibility for the errors on Taxpayer 2's 2011 tax return. He claimed the error in the dependent care credit resulted from a problem with the tax preparation software. He was not certain how the software error occurred, as he had not been able to replicate the error. He claimed the error for the ten percent early withdrawal penalty was the fault of the preparer of the Form 1099-R, because the plan administrator should have entered a different distribution code.

In Lewis's summary of her investigation, contrary to her earlier statement in the facts, she concluded that Walker must not have entered the box 10 amount of $5,000 from Taxpayer 2's W-2 when he initially prepared the return. When Walker entered information to prepare an amended return for Taxpayer 2, Form 2441 populated correctly and showed Taxpayer 2 was not entitled to the credit. Walker had not been able to duplicate the error. Even if it were a problem with the software, he should have reviewed the tax return and known that the taxpayer was not entitled to the tax credit because the taxpayer had received dependent care benefits.

Lewis expressed concern that Walker did not have enough experience and should be working under the guidance of another CPA. He had demonstrated difficulty correctly completing a simple tax return. He advertised trust and estate work as an area of practice for his law firm, but tax returns for these entities are more complicated that the simple individual returns that he prepared.

13

Based on the portion of the amended return that Lewis received from Taxpayer 2 showing corrections to the original return, Lewis concluded that Walker amended Taxpayer 2's 2011 tax return on December 26, 2013, and identified the Corporation as the paid preparer of the return. Lewis noted that the Board sent Walker a deficiency letter on July 14, 2014, with respect to the Corporation's license, but Walker had not responded to the letter and the Corporation continued to be delinquent.

The Corporation's certificate was renewed on November 5, 2014.

## Amended Accusation

On August 12, 2015, the Complainant filed an amended accusation alleging Walker committed errors in preparing tax returns for Taxpayer 1 and Taxpayer 2. The following causes for discipline were alleged: (1) gross negligence in the preparation of Taxpayer 1's return; (2) repeated acts of negligence in the preparation of Taxpayer 1's returns in violation of section 5100, subdivision (c); (3) discipline under section 5100, subdivision (g) for willful violation of the requirement to comply with all applicable professional standards as required by Board Rule 58 (Cal. Code Regs., tit. 16, § 58) in the preparation of Taxpayer 1's return;[4] (4) repeated acts of negligence in the preparation of tax

---

[4] "Licensees engaged in the practice of public accountancy shall comply with all applicable professional standards, including but not limited to generally accepted accounting principles and generally accepted auditing standards." (Cal. Code Regs., tit. 16, § 58.)

14

returns for Taxpayer 2 and his wife in violation of section 5100, subdivision (c); (5) discipline under section 5100, subdivision (g) for willful violation of the requirement to comply with all applicable professional standards under Board Rule 58 in the preparation of Taxpayer 2's return; and (6) the Corporation was subject to discipline under section 5100, subdivision (g), for willful violation of certain relevant code sections prohibiting practicing without a permit by preparing an amended tax return for Taxpayer 2 and his wife while the Corporation's license status was expired.

On November 11, 2016, Walker issued subpoenas seeking the notes of Lewis and two other individuals at the investigatory hearing "regarding the results of any voting by the hearing panel." Complainant filed a motion to quash the subpoenas and issue a protective order based on the deliberative process privilege provided in Evidence Code section 1040, which is incorporated in administrative hearing discovery procedures under Government Code section 11507.6, subdivision (f).

Walker filed a trial brief and final exhibit list. Complainant filed a list of exhibits, including Lewis's resume.

**Evidentiary Hearing and Closing Argument**

An evidentiary hearing was held before an administrative law judge (ALJ) from December 13 to 15, 2016.[5] Walker

---

[5] Walker filed a petition in the trial court on May 10, 2016, for a peremptory writ of prohibition that sought dismissal of the accusation. The Board's demurrer to this petition was sustained and the petition was dismissed. Walker appealed and this appellate court affirmed the dismissal on December 8, 2017.

appeared in pro per.  The ALJ granted the Complainant's motion to quash Walker's subpoenas.  The ALJ found that Walker's subpoenas sought disclosure of the mental processes by which the Board's decision was reached, or notes and records from conversations, discussions, debates, and deliberations that served to inform the Board.

Lewis testified that she has been licensed to practice as a CPA in California since 2003.  She took accounting classes, completed the CPA exam, and worked for a public accounting firm.  She has worked as an Investigative CPA for the Board for seven years.  In her position, she investigates complaints filed by the public, as well as internal referrals.  As an investigative CPA, she is required to be familiar with state laws and regulations applicable to the practice of accountancy, as well as professional standards with which certified public accountants practicing in California are required to comply.

The Complainant's attorney questioned Lewis about her relevant work history and training, then sought to move her resume into evidence.  Walker objected on the ground of relevance, arguing Lewis was testifying about factual matters, not as an expert witness.  The ALJ agreed with Walker, but concluded Lewis's resume was relevant to her background and the basis of her testimony about her investigation.

Shortly after, when the Complainant's attorney questioned Lewis about error codes from the software program that rejected Taxpayer 1's federal return, the ALJ sustained Walker's objection to a leading question.  The Complainant's attorney stated, "I'm presenting this witness as an expert witness.  [¶]  Do I need to

_____

(*Walker v. Office of Administrative Hearings* (Dec. 8, 2017, B277315 [unpub. opn.].))

16

have additional qualification of her?" The ALJ asked, "You're now designating her as an expert?" Walker objected that he had not been provided notice of the expert designation. The Complainant's attorney replied, "She was working as an investigative CPA for the Board of Accountancy. She's an expert in certified public accountancy practice for this state, and I don't know what more I would need to do to qualify her to testify as an expert." The ALJ stated that designating Lewis as an expert simply to ask leading questions was problematic. The ALJ added, "I understand she has expertise . . . as a CPA and may be able to testify based on her experience[.]" The Complainant's attorney stated, "[M]y client has brought charges alleging gross negligence and negligence. So eventually we will get to these issues, but you're right. [¶] I can try to ask the questions in another way to avoid the objection for now, but we will eventually get to this issue, because we will be attempting to establish the witness and we will be offering her opinions that [Walker's] acts committed gross negligence and repeated acts of negligence." The ALJ responded, "Well, whether she can testify as an expert, I will take under submission. I would like you to proceed as though she's not, though." The Complainant's attorney acknowledged, "All right."

A few questions were asked based on Lewis's training and experience. Each time Walker objected on the ground that she was not an expert and was present to testify to the facts only. The ALJ allowed testimony based on Lewis's opinion as an investigator. Lewis testified that as an investigative CPA, she was familiar with the standard of care and ordinary standards of conduct for preparation of tax returns for CPAs practicing in

17

California. One of her tasks was to determine whether Walker's services complied with those professional standards.

Lewis explained that a tax preparer does not need to be a licensed CPA, but a licensee must comply with professional standards even while performing a task that a non-licensee could perform. Board Rule 58 requires licensees engaged in the practice of accounting to comply with all professional standards, including but not limited to, generally accepted accounting principles (GAAP) and generally accepted auditing standards (GAAS). Treasury Circular 230 is a guideline issued by the Internal Revenue Service (IRS) for persons practicing before the IRS.[6] The Complainant also relies on and adheres to standards promulgated by the American Institute of Certified Public Accountants (AICPA), which are the professional standards that all CPAs should follow in preparing tax returns. The AICPA standards provide that a member shall comply with standards imposed by the taxing authority, and Circular 230 requires the exercise of due diligence. A CPA in California must use due diligence or proper care to minimize mistakes when preparing a tax return.

---

[6] "[T]he Secretary of the Treasury publishes regulations governing 'practice' before the IRS in the Code of Federal Regulations, Title 31, part 10. These regulations are commonly known as 'Circular 230.' Most of Circular 230 outlines duties and restrictions concerning 'practice' before the IRS as they relate to practitioner character, reputation, and competency. *See* 31 C.F.R. §§ 10.20–.38. The IRS has applied these regulations to attorneys, CPAs, and other specified tax professionals. *See* 31 C.F.R. § 10.3 (2009)." (*Ridgely v. Lew* (D.D.C. 2014) 55 F.Supp.3d 89, 91–92.)

Lewis testified about her investigation, her findings, Walker's testimony at the EAC hearing, and her conclusion that Walker was negligent in filing the tax returns for Taxpayer 1 and Taxpayer 2. Lewis noted that Walker prepared just eight tax returns for 2011. Walker did not exercise due diligence in completing Taxpayer 1's tax engagement and failed to obtain a signed Form 8897 from Taxpayer 1 prior to attempting to submit her return electronically.

With respect to preparation of the return for Taxpayer 2, Lewis testified that a competent CPA would have entered the receipt of $5,000 in dependent care benefits on the input screen for the W-2. The software would have automatically generated page two of the form and precluded the tax credit. Page two was not generated on the copy of the original return that Walker provided to Taxpayer 2. The standard of practice requires a CPA in California to review tax returns prepared on tax software like Lacerte. The amended Form 1040 showed that the software program picked up the receipt of $5,000 in dependent care benefits and determined the taxpayers were not entitled to the dependent care credit. A competent CPA preparing the tax returns for Taxpayer 2 would have also entered the code for the distribution on the 1099-R and made a note that it was an early withdrawal penalty.

Lewis testified about her conclusion that Walker prepared an amended return for Taxpayer 2 listing the Corporation as the paid preparer during the time when the Corporation was not licensed. An amended tax return has a Form 1040X on the top and a corrected Form 1040 is typically attached to it. Although Taxpayer 2 did not provide Lewis with a copy of a Form 1040X, he provided the supporting Form 1040 that Walker prepared

19

reflecting corrections from the original return and prepared under the license of the Corporation. The corrected Form 1040, along with Walker's email transmitting an amended return, supported Lewis's conclusion that Walker prepared an amended return for Taxpayer 2 which listed the Corporation as the paid preparer.

Walker cross-examined Lewis about her definition of relevant terms. Lewis defined gross negligence as an extreme departure from the standard of care and defined negligence as having done something wrong, making a mistake, or not doing what the person needed to do. In her professional opinion, any mistake in the preparation of a tax return was negligence.

Walker's case was the first time that Lewis had testified in an administrative hearing. She stated that she discussed her concept of negligence with coworkers at the Board, but it was not clear whether she discussed with them her definition of negligence or conduct that she considered to be negligent. She did not remember doing any research of tax laws in the course of her investigation. She consulted tax publications and instructions for the tax returns.

At the lunch recess, Walker asked that his expert witness William Wolf to be taken out of order to testify in the afternoon. The Complainant's attorney responded that the Board's case would be finished once Lewis's testimony was completed, because Lewis was the Complainant's only witness. The ALJ asked, "She's your only witness?" The Complainant reserved the right to call Walker in the event that he did not testify. Because Walker needed a few additional hours for cross-examination of Lewis, however, Wolf was taken out of order.

20

Wolf testified that Walker exercised due diligence and prepared the tax returns correctly based on the information received from the taxpayers. Wolf believed Taxpayer 2 did not owe an early withdrawal penalty for the annuity withdrawal, because the form showed no contributions had been made in the past five year and Taxpayer 2 provided additional information to Walker that caused him to believe the contribution was withdrawn in the year it was made.

At the beginning of the third day of the hearing, prior to Wolf resuming his testimony, Walker asked the ALJ to clarify whether Lewis was going to be admitted as an expert or whether her opinion would be considered expert opinion. Walker reminded the ALJ that the expert determination had been deferred. The ALJ stated, "[M]y determination is that she is here as the investigator for the Board and not as an expert." The Complainant's attorney asked the reason that the ALJ had determined Lewis was not an expert. The ALJ stated, "Because she's a percipient witness, I don't think her qualifications to be designated have been established."

In Wolf's opinion, it is possible to make a mistake on a tax return without being negligent, and not every error on a tax return should be found to be negligence. He defined negligence as requiring a departure from the standard of care, materiality, and causation of harm. A material mistake in a tax return that should have been caught could be negligence if it caused harm. A violation of section 5100, subdivision (c), did not necessarily require harm. The violation may result from enumerated conduct such as dishonesty, for example. But a violation of section 5100, subdivision (c), based on gross negligence or repeated acts of negligence required harm. The standard of care

21

requires due diligence. He considered Walker's statement to Taxpayer 1 asking her to seek tax advice elsewhere to constitute disengagement. Wolf was not aware of any professional standards for disengagement.

Wolf testified that if a client presented him with Taxpayer 1's 1099-MISC, he would generally report it as other income on line 21, but circumstances might exist where he would report it as wages on line 7. If a client had presented the 1099-MISC and said she wanted to file a Form 1040, rather than a Form 1040A, there had to be reason to refuse, but he believed there was merit to Walker's position.

Wolf explained that a tax preparer prints paper copies of tax returns for the clients from the software in the office. The information that is e-filed with the IRS does not appear to the IRS in the form of a paper copy or PDF of the tax return. The IRS captures the fields that were input into the return. Although the paper tax return printed for Taxpayer 2 did not show $5,000 in dependent care benefits having been reported, the IRS notice of discrepancy clearly stated $5,000 in dependent care benefits had been correctly reported. Based on the statement in the IRS notice, Wolf concluded the IRS had captured a field showing the tax preparer inputted $5,000 in dependent care benefits that Taxpayer 2 received. No one knows why the Lacerte software calculated a $600 credit instead of printing page two of the Form 2441 for child and dependent care expenses. The software should have completed the form to show the taxpayer was not eligible for the dependent care credit. Wolf stated that CPAs generally rely on the computer software, but if the computer software makes an obvious mistake, hopefully in reviewing the return, the CPA will discover the mistake. It is very common for tax software to have

bugs and for manufacturers to issue updates every few weeks to remedy the bugs.

As Lewis prepared to resume giving testimony, Walker announced that based on her prior testimony, Walker perceived her to be a hostile witness and had no further questions. In re-direct, the Board's attorney asked Lewis whether Wolf was correct that the tax instructions could be reasonably interpreted to mean income retains its character as wages. Walker objected on the ground of relevance, because Lewis was not testifying as an expert. The ALJ found Lewis investigated the allegations against Walker and could testify about how she reached her recommendations to the Board.

Walker's expert Kim Onisko also testified. Onisko testified that Walker was not required to comply with AICPA's statements on standards for tax services, because Walker was not a member of the AICPA. Even if Walker were required to comply, reasonable individuals could conclude that Walker had correct numbers on Taxpayer 1's tax return, because regardless of which line the deceased son's wages was on, there was no change in tax and no damages or harm to the taxpayer. In addition, the return was never filed. Onisko testified that there were differences between errors, mistakes, negligence, and gross negligence. In his opinion, there was no gross negligence shown as to either return. At most, the choices could be described as mistakes in the draft of Taxpayer 1's return and not negligence. Walker was not required to refund the fee that had been paid, other than for customer service purposes, because even though the return had not been filed, work had been done.

In Onisko's opinion, the failure to catch the software error that allowed Taxpayer 2 to report both types of child care benefits

was a mistake that did not rise to the level of negligence. Onisko noted that 1099-Rs are often incorrect because they are prepared by banks and investment companies with improper distribution codes and incorrect numbers. No portion of the annuity had been listed as the taxable portion. In Onisko's opinion, if a CPA asks the taxpayer to provide all relevant tax documents and the taxpayer fails to provide the 1099-G for a taxable state refund, the CPA's failure to include the taxable amount would not be negligent. Onisko would have asked about receipt of a taxable state refund, but did not have any information showing Walker did not ask.

A licensed CPA is required to exercise due diligence in preparing and filing tax returns. Onisko defined due diligence as utilizing proper care so there are as few mistakes as possible. Based on the research Walker did in preparation of Taxpayer 2's return, Onisko opined that Walker exercised due diligence. Onisko teaches new tax preparers to comply with the standard of care by reading the form, reading the instructions, and following up with publications and auxiliary third-party information to assist in characterization. Onisko explained that the Lacerte software selected Form 1040A based on the input of wage income only. To input wage income only and prepare a Form 1040, Walker would have had to disable the Lacerte program's default settings.

The parties filed written closing arguments. Among other points, Walker argued the Complainant failed to offer the opinion of an expert as to the professional standards applicable to any of the causes for discipline. Walker stated that the Complainant's sole witness Lewis was found to be unqualified as an expert and had testified merely as a percipient witness. As a result, the

24

Complainant had not met the burden to establish the applicable professional standard and the causes for discipline should be dismissed. In contrast, Walker had offered the testimony of two expert witnesses on the applicable professional standards. Since the Complainant failed to satisfy the burden of producing evidence of a violation of professional standards, Walker had no duty to even respond. In addition, the Complainant had to meet the heightened standard of clear and convincing proof to a reasonable certainty.

In the Complainant's closing argument, the Complainant stated that expert testimony was required to establish negligence only where the professional significance of the underlying facts seemed beyond the comprehension of a lay person. The Complainant argued that several of the negligence issues presented in the case did not require an expert CPA's technical knowledge for resolution. These included Walker's treatment of Taxpayer 1, refusal to comply with instructions on the back of the form to report 1099-MISC income, and failure to communicate to Taxpayer 1 a comprehensible reason for rejecting the instructions. Alternately, the Complainant argued, negligence was the degree of care which would have been exercised by a competent professional. The Complainant referred to Lewis's testimony to support negligence under this standard. The Complainant also argued that Walker's experts' definitions of negligence and opinions of the industry standard of care were incorrect.

25

## ALJ's Proposed Decision

On February 13, 2017, the ALJ issued a proposed decision. The ALJ noted that the standard of care is a question of fact usually proven through expert testimony. The relevant standard of care was the use of a reasonable degree of skill, care, and knowledge ordinarily possessed and exercised by members of the profession under similar circumstances at the time of the incidents at issue. Lewis, an investigative CPA with the Board for seven years, testified that in evaluating the conduct of licensees, the Board adheres to the Statement on Standards for Tax Services and Circular 230. The ALJ found appellants had a duty to comply with the cited portions of the Standards and Circular 230. The ALJ found Wolf and Onisko's definitions of negligence under section 5100, subdivision (c) to require harm were incorrect. A mistake on a tax return is by its very nature a departure from the standard of care for a CPA, although an isolated instance of ordinary negligence was not cause for discipline.

The instructions for Form 1040A returns and the printed instructions on the reverse side of Form 1099-MISC both directed Taxpayer 1 to report 1099-MISC income on Form 1040. Walker failed to comply with the instructions by reporting the income as wages on line 7 of Form 1040A. The failure to comply was not a departure from the standard of care, however, unless Walker failed to exercise due diligence in taking this tax position, caused unreasonable delay by doing so, or made false representations. The publications support a colorable basis to report the income as wages on line 7 of Form 1040A. Walker's conduct in response to Taxpayer 1's request to file Form 1040 supported finding that he

had performed the necessary analysis in his preparation of the return. Walker's failure to comply with the instructions was not a breach of his duty to exercise due diligence, and Taxpayer 1's return was not rejected because income was reported on the wrong form. The return was rejected because the data entered did not match the IRS records. Walker's conduct in reporting the income as wages on line 7 of Form 1040A was not a departure from the standard of care.

However, appellants departed from the standard of care in other respects. By electronically filing the return for Taxpayer 1 without a signed authorization, appellants breached their duty not to give false or misleading information on a federal tax return.

There was a legal basis to report the income as miscellaneous income on line 21 of Form 1040, as requested by the client. Wolf testified that he reports all client income on Form 1040, overrides the Lacerte software if it prints Form 1040A, and there is no advantage to filing one form or the other. Wolf and Onisko both testified that they would accede to the client's wishes to take a particular tax position if it was supported by the law. Walker breached his duty to determine the correctness of his representations to Taxpayer 1 with respect to her returns when he said the IRS instructions that she had cited were wrong without providing any analysis. He further departed from the standard of care by falsely telling Taxpayer 1 that her return was rejected because he did not have the address of her son's employer.

Walker's refusal to correct and refile Taxpayer 1's return was unfounded. Walker took no steps to cure the data entry error and refile the return as directed by the diagnostic report,

opting instead to disengage from the client before her return was filed. These actions caused unreasonable delay in the filing and acceptance of her return.

Walker failed to exercise due diligence in preparing Taxpayer 2's joint income tax return. The ALJ concluded that Walker did not enter the dependent care benefits paid by the employer, so the software generated Form 2441 reflecting a $600 credit for child and dependent care expenses, erroneously reducing Taxpayer 2's tax liability, although the trial court later disagreed with this finding. The ALJ also found Walker failed to report additional tax required for an early distribution from an annuity. The ALJ concluded that whether the errors were caused by a data entry error or a software glitch, Walker failed to catch the errors, which was a breach of his duty to exercise due diligence in determining the correctness of the representations made on the return.

Although the annuity distribution may have been properly reported as explained by Wolf, Walker's conduct after reviewing the tax deficiency notice showed this research was not part of his due diligence in determining the correctness of the information reported on the return. Instead, he acknowledged a mistake and sent the client an amended return to correct the mistake.

Without evidence that Taxpayer 2 furnished information to Walker about the state tax refund, however, Walker did not depart from the applicable standard of care by failing to include the state tax refund in gross income.

If Walker had used the reasonable degree of skill, care, and knowledge ordinarily possessed and exercised by other CPAs under similar circumstances, he would have known the return for Taxpayer 1 was not rejected because the address was entered

28

incorrectly, followed the steps provided on the rejection notice and filed a corrected return, heeded the client's reasonable request to file Form 1040, and caught the mistakes on the return prepared for Taxpayer 2. These departures from the standard of care constituted repeated acts of negligence, involving multiple breaches of Walker's duty to exercise due diligence, and a failure to comply with professional standards.

The Complainant presented clear and convincing evidence to prove Walker engaged in repeated acts of negligence. Although Walker departed from the ordinary standard of conduct in many respects, the evidence was not sufficiently clear, explicit, and unequivocal to prove Walker engaged in gross negligence. The Complainant presented clear and convincing evidence that the Corporation did not hold a valid certificate at the time that an amended return was prepared and sent to the client to review. Walker knew or reasonably should have known the Corporation's certificate was issued for a two-year period and needed to be renewed every two years. Allowing the permit to expire and remain invalid for more than 18 months was sufficiently careless to constitute a willful violation of the law.

The ALJ found cause for discipline under section 5100, subdivisions (c) and (g), because Walker engaged in repeated acts of negligence, failed to comply with applicable professional standards, and practiced accountancy without a valid permit. The two engagements were relatively simple, and constituted one quarter of the returns that Walker prepared. The number of negligent acts under the circumstances increased the likelihood of recurrence and made the nature of the offenses more severe. Walker did not testify, so there was no evidence of rehabilitation, education, or implementation of changes to his business practice

to avoid a recurrence. There was no testimony or affidavit of a supervising CPA or professional support network to prevent a recurrence. There was no evidence of remorse or acknowledgment of wrongdoing. Walker maintained an attitude that no wrongdoing was committed. The ALJ proposed revocation of Walker's certificates.

The ALJ noted that the Board was authorized to recover all reasonable costs incurred to investigate and prosecute a licensee's violation of the licensing act. The ALJ found the Board's prosecution and investigation costs totaling $40,778.70 were reasonable considering the complexity of the case. However, because Walker's ability to pay was not established at the hearing, all payment was deferred until such time as Walker successfully petitioned the Board for reinstatement of any of the licenses.

## The Board's Decision

The Board was entitled to adopt, reject, or modify the proposed decision. On April 3, 2017, the Board rejected the ALJ's proposed decision and elected to decide the issues based on the record, including the hearing transcript, and additional argument of the parties. On October 2, 2017, the Board issued a decision reflecting many of the same findings of fact as the ALJ had proposed. The Board found, however, that Complainant had presented Lewis as an expert. The Board rejected the expert testimony presented by Walker. The Board credited Lewis's opinion that AICPA standard 100.4 and Circular 230 governed the standard of practice for Walker's conduct. The Board found negligence under section 5100, subdivision (c), did not require a

showing of harm. The Board added, "As explained by Ms. Lewis, a mistake on a tax return is by its very nature a departure from the standard of care for a CPA."

In addition to the grounds cited by the ALJ, the Board found Walker's conduct in failing to ensure his work met the most basic requirements for filing an electronic return showed his preparation was grossly inadequate to meet Taxpayer 1's objective to file an electronic return, which constituted incompetence under section 10.51(a)(13) of Circular 230. In addition, "[a]ny lay person applying common sense would expect that if the CPA did not perform the services that he had been hired to perform, a refund would be in order." The Board found gross negligence had not been proven, but Walker committed repeated acts of negligence, violated Board Rule 58, and the Corporation practiced accountancy without a valid permit.

The Board ordered a stayed revocation of Walker's CPA certificates and imposed a three-year probation. The Board found Walker's ability to pay the reasonable costs of investigation and enforcement had not been established at the hearing. The cost recovery was reduced to reflect that although the Complainant established nearly all of the allegations in the amended accusation, Walker had raised a colorable challenge to some of the charges. Walker was required to jointly and severally reimburse the Board during the probation period in the amount of $30,000 for investigation and prosecution costs. In addition, Walker was required to submit quarterly written reports and complete four additional hours of continuing education in certain subjects and an approved course on the provisions of the California Accountancy Act and the Board's regulations specific

31

to the practice of public accountancy. The decision became effective November 11, 2017.

## Mandamus Proceedings

On November 27, 2017, Walker filed a petition in pro per for a writ of administrative mandamus under Code of Civil Procedure section 1094.5. He alleged violations of procedural and substantive due process, including that the Board failed to provide discovery, failed to provide notice of the applicable professional standards, failed to respond to his laches defense, and made findings that were not supported by substantial evidence. The Board filed an answer on December 22, 2017.[7]

Walker filed a trial brief in support of a writ of administrative mandamus. Among other arguments, Walker asserted that the accusation was barred by the expiration of a two-year statute of limitations and the doctrine of laches. In addition, the Board's post-hearing designation of Lewis as an expert, contrary to the ALJ's finding that she was not qualified as an expert witness, deprived him of an opportunity to cross-examine her as an expert witness. The testimony of an expert witness was required to establish the standard of care, Lewis's opinion was not based on appropriate sources, and the Board's

_____

[7] Walker filed an ex parte application seeking a stay of the Board's decision. In the application, he stated that he had dissolved the Corporation in April 2016 and renewed his individual CPA license in an inactive status. He represented that he did not have the financial ability to make the quarterly payments demanded by the Board. The motion was denied on the ground that no exigency had been shown to justify an ex parte application.

reliance on Lewis for the necessary expert testimony violated due process. Walker also argued that the Board could not rely on AICPA standards or Circular 230 to establish "applicable professional standards" in this case. Walker was not a member of AICPA, and federal case law held Circular 230 was inapplicable to a CPA unless practicing before the IRS, which does not include simple preparation of tax return.

## A. Tentative Ruling

The trial court issued a tentative decision prior to the hearing on the petition for writ of mandate. The trial court found Lewis was qualified to testify as an expert. She had been licensed to practice as a CPA in California since 2003, and employed by a public accounting firm. She is familiar with the professional standards and standards of practice for a California CPA generally and for preparing a tax return. Nothing about her status as an investigator disqualified her from providing expert testimony and no particular procedure was required to proffer expert testimony.

The tentative ruling stated that the ALJ did not decide until the third day of the hearing that Lewis would not be received as an expert. Walker had the opportunity, and did, cross-examine Lewis about her opinions concerning the standard of practice. Walker did not proffer any questions that he would have asked Lewis if he had known she would be accepted as an expert. Also, the Board did not rely solely on Lewis's testimony, but also on testimony provided by Walker's experts.

The trial court concluded all three experts incorrectly defined negligence and gross negligence. Lewis was mistaken in

33

characterizing every error on a tax return as negligence, because negligence is situational. Although Lewis correctly defined gross negligence as an extreme departure from the standard of practice, she was mistaken in defining the term "extreme" as "unusual." The trial court agreed with the Board that the definitions of negligence and gross negligence provided by Walker's experts were also incorrect. Professional negligence requires conduct below a standard of practice established to protect against unreasonable harm; it does not require harm to have occurred. The trial court concluded that although all the experts incorrectly defined negligence and gross negligence, they could still provide the appropriate standard of practice. All of the experts agreed that the standard of practice required a CPA to exercise due diligence in the preparation of a tax return. Lewis was mistaken in her definitions of gross negligence and negligence, and in her conclusion that Walker was guilty of gross negligence, but her opinion that Walker breached the standard of practice in preparing the two returns had weight and constituted substantial evidence.

The trial court found that the Board could include AICPA standards as an applicable standard of practice regardless of whether appellants belonged to the organization. The only condition for the standard of practice was that they were commonly accepted in the accounting profession. Lewis testified that the AICPA's standards for tax preparation were the accounting profession standards. Wolf and Onisko had admitted the AICPA's GAAP and GAAS are the applicable standards for auditing and accounting. The evidence was sufficient to require appellants to adhere to standards of a private organization to

34

which they did not belong, and the standards were not an "underground regulation."

Federal case law enjoined enforcement of Circular 230 against CPAs who simply prepare tax returns and do not represent taxpayers by appearing before the IRS in a tax proceeding. As a result, Circular 230 was not a standard of practice for tax preparers. Lewis referred to Circular 230 in her testimony, however, as providing guidelines for tax preparers. Circular 230 provides that a CPA representing a taxpayer before the IRS must exercise due diligence in preparing the return and determining the correctness of representations to the IRS, not unreasonably delay preparing and filing the return, and prevent giving false information to the IRS. All of the witnesses agreed that the standard of practice requires CPAs to exercise due diligence in preparation of a tax return, so Circular 230 may be used as a guideline to evaluate due diligence even though enforcement has been enjoined by the federal courts.

The trial court concluded in the tentative decision that Walker was guilty of repeated acts of simple negligence in handling the tax returns of Taxpayers 1 and 2. Abandonment of Taxpayer 1 was the most significant failure. Lewis had made overstatements, especially in opining that Walker was grossly negligent, but the Board correctly concluded that Walker's repeated acts of negligence suggested a lack of competency in the practice of public accountancy, because Walker negligently completed a quarter of the returns that he prepared for the tax year 2011.

## B. Hearing and Judgment

A hearing was held on July 9, 2019, at which Walker represented himself. The trial court noted that although the doctrine of laches could be significant, Walker had not set forth the elements of laches, provided any citation to the applicable statute of limitations for the Complainant to file an accusation with the Board, or argued prejudice.

The trial court concluded from its independent review of the record that the Board's findings of negligence were supported by substantial evidence. The Board had erroneously found Walker did not enter Taxpayer 2's receipt of $5,000 in dependent care benefits. In fact, Walker's negligence was in reporting receipt of $5,000 dependent care benefits and taking a $600 credit for child care expenses. But the Board's error did not undermine its overall conclusion.

Walker argued that although the trial court agreed with the Board that Lewis was qualified to testify as an expert, he had not been given the opportunity to question her as an expert. The ALJ instructed the parties on the first day of the administrative hearing to question Lewis as though she were not an expert. The Board argued in response that it was not until the third day that the ALJ determined Lewis would not be considered an expert witness. The trial court initially agreed with the Board that the parties had extensive opportunities to question Lewis before the ALJ ruled that she did not qualify as an expert on the third day of the administrative hearing.

Based on Walker's arguments, however, the court reviewed the reporter's transcript of the ALJ's statements on the first day of the administrative hearing when the ALJ directed the parties

to proceed as if Lewis were not an expert. The trial court asked Walker to explain how he was prejudiced. Walker stated that he had planned to question Lewis about the material that she relied on to reach her conclusions, which he believed to be an inappropriate basis for expert testimony. He had wanted to question her about the tax laws that she relied upon and how she formulated her opinion.

The Board argued that Walker chose not to cross-examine Lewis further because he deemed her to be a hostile percipient witness and he had said he had no further questions for her. The trial court noted there was sufficient evidence in the record to conclude that Lewis was an expert, but found it problematic if the ALJ limited Walker's examination of her as an expert, including her knowledge as an expert and her opinion on the standard of practice as an expert. The Board argued Walker had in fact treated Lewis as an expert, asked her the types of questions that would be asked of an expert, had an opportunity to cross-examine her, and cross-examined her extensively on her opinion as to the standard of practice. The Board also argued that Walker had two experts testify on the standard of practice, so there was plenty of evidence of the standard of practice in the record. The trial court explained that it was not fair to limit the licensee's examination of a witness as an expert, then have the Board decide after the proceeding was over that the witness is an expert. The Board argued that Walker's conduct was so obviously negligent that expert testimony was not required. The trial court disagreed that the conduct was so egregious that expert testimony on the standard of practice was not necessary.

The court ruled that Walker did not have an opportunity to cross-examine Lewis as an expert witness. Lewis was an expert,

37

but Walker was entitled to voir dire her on her expertise and what she did as an expert to formulate her opinion. The trial court concluded that the matter must be remanded for additional examination of Lewis. No other witness would be permitted to testify. In all other respects, the tentative was adopted as the court's order.

On August 20, 2019, the trial court entered judgment granting the petition in part for the sole purpose of allowing Walker to further cross-examine Lewis. The parties would not be permitted to offer or examine any other witnesses in the remand process. In all other respects, the petition was denied.

A writ of administrative mandate was issued to the Board on August 23, 2019. The trial court commanded the Board to vacate and set aside its decision, and to remand the matter to the Office of Administrative Hearings to allow Walker to further cross-examine Lewis in the administrative proceeding. Other than Lewis, no other witness was to be offered or examined. After the remanded hearing, the Board was to prepare a revised decision and take any further action specifically enjoined on the Board by law. Nothing in the writ limited or controlled the discretion legally vested in the Board.

Walker filed a timely notice of appeal, and the Board filed a timely notice of cross-appeal.

# DISCUSSION

## Appealability

### A. The Board

The Board contends it may appeal from the portion of the trial court's order remanding the matter for further testimony by Lewis. We agree.

In *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109 (*Dhillon*), the California Supreme Court addressed whether a trial court order vacating an administrative decision and remanding for further administrative proceedings was a final judgment appealable by the respondent. In *Dhillon*, a hospital imposed discipline on a surgeon without providing an administrative hearing. (*Id.* at p. 1112.) The surgeon petitioned for a writ of administrative mandamus to compel the respondent hospital to vacate the discipline and grant an administrative hearing, to declare that the hospital bylaws violated due process, and to authorize the surgeon to file a lawsuit for damages. (*Id.* at pp. 1112–1113.) The trial court granted the writ petition in part, ordering the hospital to grant the surgeon a hearing. (*Id.* at p. 1113.) When the hospital appealed, the appellate court concluded the remand order was not a final, appealable order and dismissed the appeal, but the Supreme Court reversed. (*Id.* at pp. 1113–1114, 1120.)

The Supreme Court first noted the general rule that a judgment is final, and therefore appealable, when it ends the litigation between the parties on the merits and nothing remains to be done but to enforce the judgment. (*Dhillon, supra,* 2 Cal.5th

at p. 1115.) "''As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory.'" [Citations.]" (*Ibid.*)

Applying these principles, the Supreme Court concluded the trial court's order was final and appealable because it granted or denied each of the surgeon's claims and "did not reserve jurisdiction to consider any issues." (*Dhillon, supra,* 2 Cal.5th at pp. 1116–1117.) "Thus, as a formal matter, once the trial court issued the writ, nothing remained to be done in that court; no issue was then left for the court's "'future consideration except the fact of compliance or noncompliance with the terms of the first decree.'" [Citations.]" (*Id.* at p. 1117.) The *Dhillon* court explained that unless the respondent had an immediate right of appeal, the trial court's interpretation of the hospital bylaws to require a hearing could effectively evade review. (*Ibid.*) If after remand, the administrative decision were decided against the surgeon and he chose not to seek review, respondent would have no basis to seek review and could not challenge the earlier ruling that the surgeon was entitled to a hearing. (*Id.* at pp. 1117–1118.) The *Dhillon* court concluded that an order remanding a matter to an administrative agency for further proceedings may be appealable by the respondent agency if the order affects substantial rights and may, as a practical matter, be unreviewable after resolution on the merits. (*Ibid* & fn. 4.)

40

Based on the reasoning of *Dhillon*, we conclude the order in this case remanding the matter for further examination of Lewis is appealable by the Board. If the proceedings after remand are decided against Walker and he chooses not to seek review, the Board would have no basis to seek review of the trial court's order to allow additional testimony.

**B. Walker**

Walker contends he may appeal from the portion of the petition denied by the trial court, because the trial court ruling will have a continuing effect on his rights in the administrative hearing and the findings will be binding in any subsequent mandamus proceeding, thereby evading review. This is incorrect.

Walker's appeal is governed by the holding in *Kumar v. National Medical Enterprises, Inc.* (1990) 218 Cal.App.3d 1050, 1055 (*Kumar*), which was distinguished by the *Dhillon* court on its facts (*Dhillon*, *supra*, 2 Cal.5th at p. 1118, fn. 4). In *Kumar*, "a doctor challenged the suspension of his hospital privileges in a petition for writ of administrative mandamus, and the trial court granted the petition in part: It set aside the decision by the hospital's governing board upholding the doctor's suspension and remanded the matter for further administrative proceedings, but it did not reinstate the doctor's privileges. The doctor appealed. The Court of Appeal dismissed the appeal, holding that the judgment was not appealable because the doctor was first required to exhaust his administrative remedies. [Citation.]" (*Ibid.*)

"Under the doctrine of the exhaustion of administrative remedies, a party must go through the entire proceeding to 'a

41

final decision on the merits of the entire controversy' before resorting to the courts for relief. (Cal. Administrative Hearing Practice (Cont.Ed.Bar 1984) § 4.68, pp. 266–267.) An appeal can be taken only from a final decision aggrieving petitioner." (*Kumar, supra,* 218 Cal.App.3d at p. 1055, italics omitted.) "[T]he setting aside of a final administrative decision because of unfair hearing practices requires a remand for further proceedings. The rationale is that the agency . . . because of error, did not fully exercise the discretion legally vested in it. By commencing further proceedings, this discretion is exercised. (See *English v. City of Long Beach* (1950) 35 Cal.2d 155, 159.)" (*Kumar*, *supra*, 218 Cal.App.3d at p. 1056.)

The *Dhillon* court distinguished the holding in *Kumar* based on the different practical consequences of the trial court's remand order. The doctor in *Kumar* would have an opportunity to appeal the hospital's discipline if he did not prevail in the administrative proceedings after remand: "He could file a second petition for administrative mandamus, and if the trial court ruled against him, he could appeal from the denial of his petition." (*Dhillon, supra*, 2 Cal.5th at p. 1118, fn. 4.)

In the case before us, the trial court vacated the administrative decision and remanded the matter for further testimony from Lewis, followed by a new decision on the merits. Because we conclude in the discussion below that the trial court properly vacated the administrative decision for further proceedings, we do not need to consider whether the decision could have additionally been vacated for other reasons as well. The Board's prior decision is not res judicata, because the trial court has ordered the prior decision vacated and set aside in its entirety. (See *Kumar*, *supra*, 218 Cal.App.3d at p. 1056). The

trial court's order remanding the matter for further testimony would be meaningless if the Board were not free to exercise its discretion based on the totality of the evidence before it. Walker must proceed again to a final administrative decision before seeking review in the courts. Until the Board has considered all of the evidence, including evidence yet to be elicited in Walker's cross-examination of Lewis as an expert witness, and made a final decision, the Board has not exhausted its power to act. A determination of all the issues must be made first by the administrative agency, and Walker is not aggrieved until such time as he may be adversely affected by a "new" final decision by the Board. We conclude Walker has not yet exhausted his administrative remedies and his appeal must be dismissed.

## Remand for Examination of Lewis as an Expert Witness

### A. Statutory Scheme

The Board's responsibilities include licensing (§§ 5023, 5033, 5080), issuing permits to engage in public accountancy practice to licensees (§ 5070, subs. (a)), continuing education (§§ 5027, 5028), promulgating governing professional rules, regulations, and standards for the practice (§§ 5018, 5060, subd. (d), 5061, subd. (e)), and disciplinary action (§ 5100).

After notice and hearing, the Board may revoke, suspend, or refuse to renew any permit or certificate to practice public accountancy, or may censure the holder for unprofessional conduct, which includes: "(c) Dishonesty, fraud, gross negligence, or repeated negligent acts committed in the same or different

engagements, for the same or different clients, or any combination of engagements or clients, each resulting in a violation of applicable professional standards that indicate a lack of competency in the practice of public accountancy . . . . (g) Willful violation of this chapter [(§ 5000 et seq.)] or any rule or regulation promulgated by the board under the authority granted under this chapter." (§ 5100, subds. (c) and (g).)

The Board has issued regulations requiring accountants to "comply with all applicable professional standards, including but not limited
to generally accepted accounting principles and generally accepted auditing standards." (Cal.Code Regs., tit. 16, § 58.)[8]

---

[8] Generally accepted auditing standards (GAAS) are "promulgated by the American Institute of Certified Public Accountants (AICPA), a national professional organization of CPA's, whose membership is open to persons holding certified public accountant certificates issued by state boards of accountancy. [Citation.]" (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 381 (*Bily*).) Generally accepted accounting principles (GAAP) "are an amalgam of statements issued by the AICPA through the successive groups it has established to promulgate accounting principles: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board. Like GAAS, GAAP include broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations." (*Id.* at p. 382.)

## B. Standard of Review

A petition for writ of administrative mandate is addressed to "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b); *Doe v. Regents of University of California, supra,* 5 Cal.App.5th at p. 1072.)

"After an administrative agency imposes discipline on a professional licensee, the trial court to which application for mandate is made exercises its independent judgment on the facts. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143–146; *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 789.) After the trial court exercises its independent judgment in reviewing the facts, the appellate court confines itself to determining whether substantial evidence supports the trial court's findings. The appellate court, however, independently exercises its ability to decide issues of law. (*Marek v. Board of Podiatric Medicine* (1993) 16 Cal.App.4th 1089, 1095–1096.)" (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 767–768.)

"'Where, as here, the issue is whether a fair administrative hearing was conducted, the petitioner is entitled to an independent judicial determination of the issue.' (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101.) We must therefore independently review the fairness of the administrative proceedings as a question of law. (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1438.)" (*Sinaiko v. Superior Court* (2004) 122 Cal.App.4th 1133, 1140 (*Sinaiko*).)

## C. Fairness of Hearing

The Board contends that the trial court erred by remanding the matter for further examination of Lewis, because the Board's determination after the hearing that Lewis was qualified to provide expert testimony did not make the proceedings fundamentally unfair, and no prejudice has been shown. We disagree.

"Due process is the opportunity to be heard at a meaningful time and in a meaningful manner. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333.) Unlike some legal rules, due process "'is not a technical conception with a fixed content unrelated to time, place and circumstance." [Citation.]' (*Id.* at p. 334.) Rather, it "'is flexible and calls for such procedural protections as the particular situation demands." [Citation.]' (*Ibid.*) Determining whether a particular administrative procedure is constitutionally sufficient requires analysis of the governmental and private interests involved: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and any probable value of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (*Id.* at p. 335.)" (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 543.)

California law does not require that every administrative hearing provide an opportunity to confront and cross-examine witnesses *(Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1084), "[b]ut in 'almost every setting where

important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.' (*Goldberg v. Kelly* (1970) 397 U.S. 254, 269.)  The right to cross-examine applies in a wide variety of administrative proceedings.  (*Giuffre v. Sparks* (1999) 76 Cal.App.4th 1322, 1330 [disciplinary hearings]; *Davis v. Mansfield Metropolitan Housing Authority* (6th Cir.1984) 751 F.2d 180, 185 [housing authority]; *Welfare Rights Organization v. Crisan* (1983) 33 Cal.3d 766, 769 [welfare]; *Pence v. Industrial Acc. Comm.* (1965) 63 Cal.2d 48, 50–51 [industrial accident]; *Desert Turf Club v. Board of Supervisors* (1956) 141 Cal.App.2d 446, 455 [use permit].)  It is especially important where findings against a party are based on an adverse witness's testimony.  (*Fremont Indemnity Co. v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 965, 971; *Palmer v. Rent Control Board of Brookline* (1979) 7 Mass.App.Ct. 110 [rent control board erred by not allowing landlord to cross-examine investigator who provided report to the board].)"  (*Manufactured Home Communities, Inc. v. County of San Luis Obispo* (2008) 167 Cal.App.4th 705, 711.)

A witness who meets the threshold test for qualification and is permitted to testify as an expert on direct examination, "'is subject to as penetrating a cross-examination as the ingenuity and intellect of opposing counsel can devise.  This inquiry may challenge not only the knowledge of the witness on the specific subject at issue, but also the reasons for his opinion and his evaluation of any written material upon which he relied in preparation for his testimony.' [Citation.]" (*Sinaiko, supra,* 122 Cal.App.4th at p. 1142 [admission of medical expert opinion].)

In this case, Lewis was the Board's sole witness.  Any findings against Walker turn on the credibility and weight of

47

Lewis's testimony. Walker faces severe consequences, including potential deprivation of his license and substantial liability for investigation costs. Walker, who had been recently admitted to practice law, represented himself in the administrative hearing, in the trial court, and now represents himself on appeal. He never had an opportunity to cross-examine Lewis regarding her qualifications and opinion as an expert, including the reasons for any opinion and evaluation of any written material upon which she relied, because the ALJ consistently ruled throughout the administrative hearing that Lewis was not testifying as an expert witness. At the outset of Lewis's testimony, the ALJ instructed the parties to question her as a percipient witness only, not as an expert, until such time as the ALJ ruled directly on her qualifications. Prior to resuming cross-examination of Lewis, Walker asked the ALJ to rule on whether she would be permitted to testify as an expert witness; Walker stated he had two additional hours of questions for her. The ALJ ruled, consistent with prior instructions to the parties, that Lewis was testifying as a percipient witness only. Once the ALJ confirmed that Lewis was not testifying as an expert witness, questions addressed to her knowledge as an expert were irrelevant. As a tactical matter, the Complainant did not have the testimony of an expert witness to establish the standard of practice. Walker chose not to question her further. When the Board later designated Lewis as an expert, after completion of the hearing, the Board undermined the fairness of the proceeding by depriving Walker of an opportunity to vigorously cross-examine Lewis on her expert opinion, and by making findings against Walker based on the unchallenged testimony. For example, Walker contends that Lewis relied solely on IRS publications and form instructions to

form her opinions, which he contends is not the type of material reasonably relied upon by CPA experts. Walker had no opportunity to cross-examine the basis of her opinions as an expert witness to show that she did not rely on authoritative sources of federal tax law. The trial court correctly ordered the matter remanded to the Office of Administrative Hearings to allow further examination of Lewis, and for the the Board to exercise its legally vested discretion based on a consideration of all the evidence.

## DISPOSITION

The judgment is affirmed. In the interests of justice, the parties are to bear their own costs on appeal.

MOOR, J.

We concur:

BAKER, Acting P.J,

KIM, J.